**Grant D. MOCTAR, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–1122, 96–CO–1019.**

District of Columbia Court of Appeals.

Argued May 13, 1998.

Decided Sept. 3, 1998.

Mark J. Rochon, Washington, DC, for appellant.

Barbara J. Valliere, Assistant United States Attorney, for appellee. Wilma A. Lewis, United States Attorney, John R. Fisher, Thomas J. Tourish, Jr., Stephanie G. Miller and Silvia Gonzalez Roman, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY and STEADMAN, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

Appellant Grant D. Moctar, along with two confederates, plotted and carried out the robbery and murder of a drug dealer, Juan McWeay, and the serious wounding by a bullet through the head of the drug dealer's companion, Ralph Cherrico. The details are set out at length in our opinion, also released today, in *Green v. United States*, 718 A.2d 1042 (D.C.1998), and need not be repeated here.[1] Appealing his convictions, appellant argues that the trial court committed reversible error in 1) the conduct of the inquiry

---

1. The defendants in *Green* were tried separately from Moctar, but the evidence in the two trials revealed essentially the same facts.

regarding his right to testify, 2) not granting an overnight continuance to secure a missing defense witness, and 3) refusing to suppress his videotaped statements. We affirm.

## I. The Request for a Continuance

■ We begin with appellant's second issue, although the least substantial, because it bears upon his first issue. On January 24, 1994, a trial date of May 31, 1994, was scheduled. On Wednesday, June 1, the case was certified to the trial judge for trial and proceeded through the week. That Friday, June 3, the trial court alerted defense counsel that he should be ready with witnesses late Monday morning, June 6, and that it would be on a "speed track."

After the weekend had passed, the trial resumed on Monday morning with what were essentially some closing witnesses for the prosecution, mainly to authenticate exhibits. The defense case began shortly before lunch with an expert medical witness.[2] Cross-examination of that witness occurred after lunch. Defense counsel then told the trial court that to be "quite candid with you, my position would be not to call anyone at this point beyond this." However, after talking with his client, counsel asked for an overnight continuance so that he could present one other witness for about fifteen minutes of testimony.

Specifically, defense counsel proposed that "we do jury instructions and that sort of thing now and just give me fifteen minutes in the morning to put that witness on." The trial court replied that "[w]e are going to do the jury instructions and argument today, as well as whatever witnesses you have. I don't know what made any of you think that we weren't finishing this case today, you all know I have another case scheduled for to-

morrow morning." Defense counsel responded, "I understand that, Your Honor." The defense then put on an alibi witness and rested, following which defense counsel and the trial court resumed the discussion of the missing witness, who was identified as Rondale Pinkney. During the discussion, no proffer was made as to the nature of Pinkney's testimony nor its importance to the defendant. The trial court ascertained that defense counsel had not subpoenaed the witness for these trial dates, although she had been under subpoena four times previously when the trial date was postponed.[3] Reiterating a point it had made previously,[4] the trial court noted the absence of a subpoena and again denied the request for more time.

■ As we have repeatedly held, the grant or denial of a continuance rests within the sound discretion of the trial judge, to whom we accord wide latitude. *See Little v. United States*, 709 A.2d 708, 715 n. 17 (D.C. 1998); *Owens v. United States*, 688 A.2d 399, 404 n. 3 (D.C.1996); *Edelen v. United States*, 627 A.2d 968, 972 (D.C.1993); *Tucker v. United States*, 571 A.2d 797, 800 (D.C.1990). "To establish abuse of that discretion, the defendant must, at the minimum, make some showing of prejudice." *Mack v. United States*, 637 A.2d 430, 432 n. 3 (D.C.1994). Hence, a party seeking a continuance to locate a missing witness

"must make a showing that such continuance is 'reasonably necessary for a just determination of the cause.'" *O'Connor v. United States*, 399 A.2d 21, 28 (D.C.1979) (citing *Brown v. United States*, 244 A.2d 487, 490 (D.C.1968)). In fulfilling this requirement, the movant must make a five-fold showing. He or she must establish (1) who the missing witness is, (2) what the witness' testimony would be, (3) the rele-

---

2. The witness testified about the possible consequences of the head wound received by Cherrico on the veracity of his testimony as a key government witness.

3. Counsel explained his failure by saying that he had tried to subpoena her over the weekend but did not have the right address.

4. The trial court had said to defense counsel: [Y]our obligation is to ask me very early on to enforce the subpoena. That is my only ability

as a trial judge, to enforce the subpoena by issuing a bench warrant for that person's arrest. That is my only enforcement of the law. I don't have any other enforcement tools, and it is not an answer to continue a case. Indeed, in my judgment it is an outrage against the citizens of the District of Columbia who sit on our juries for us to be continuing cases while we get one witness for fifteen minutes three days later.

vance and competence of that testimony, (4) that the witness could probably be obtained if the continuance were granted, and (5) that the party seeking the continuance has exercised due diligence in trying to locate the witness.

*Bedney v. United States,* 684 A.2d 759, 766 (D.C.1996).

Applying this standard, we see no basis for reversal. Defendant had ample opportunity to prepare his case. The trial was in its fourth day. The witness had not been subpoenaed. No proffer was made as to the relevance of the witness to the defendant's case.[5] The trial court did not abuse its discretion in denying the request for a continuance.

We turn now to appellant's first argument, which also involved possible trial delay.

## II. The *Boyd* Inquiry

 In *Boyd v. United States,* 586 A.2d 670, 674–75 (D.C.1991), we held for the first time[6] that a defendant's right to testify in a criminal trial "is a fundamental and personal right which can only be waived by the defendant," and that such a waiver must be " 'an intentional relinquishment or abandonment of a known right or privilege,' " (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Thus, we said, the defendant's right to testify is "one of those constitutional rights in which the *Johnson v. Zerbst* standard must apply in determining whether the defendant has waived that right." *Id.* at 677.

However, we did not have occasion to determine precisely how to apply that standard. We acknowledged three prevailing approaches: one would require the trial court at trial to engage the defendant in an on-the-record colloquy to determine whether the waiver is voluntary and intelligent, another would impose a duty on the defendant to affirmatively demand at trial his or her right to testify in order to preserve it for a post-trial challenge, and the third would not require trial court or defendant action at trial but would allow the defendant freely to bring a post-trial challenge. We effectively rejected both the first and second alternatives. However, given our holding on the fundamental nature of the right and the requirement of a personal waiver, we urged trial courts to engage in what is now sometimes known as a *Boyd* inquiry:

> We take this occasion ... to advise the trial court and the Bar, that while we do not today hold that the trial court has a *sua sponte* obligation to inquire of a non-testifying defendant before the defendant rests whether the defendant has waived the right to testify, it behooves the trial court to make such an on-the-record inquiry in order to avoid issues on appeal and collateral attacks.

*Id.* at 678 (footnotes omitted).[7]

Pursuant to that behooval, the trial court, after the defense rested without the defen-

---

**5.** Appellant argues that such a proffer was unnecessary because Pinkney had testified at the suppression hearing. However, that hearing was held before a different judge; the trial judge here had no way of knowing what the proposed testimony would be, even assuming that it would be the same as at the suppression hearing.

In a motion for a new trial, made almost two years after his conviction and based solely upon the refusal to grant a continuance to permit Pinkney to testify, appellant proffered what he expected of Pinkney's testimony, but no affidavit by Pinkney herself was attached. *See Fields v. United States,* 698 A.2d 485, 489 (D.C.1997) (failure to attach witnesses' affidavits "itself a sufficient ground to reject without a hearing allegations of ineffectiveness [of trial counsel] premised on the failure to call them"), *cert. denied,* — U.S. —, 118 S.Ct. 1203, 140 L.Ed.2d 331 (1998). Even if Pinkney did testify as proffered in the motion, the nature of the testimony does not appear likely to have affected the outcome.

It would have dealt mainly with the circumstances surrounding Moctar's trip to the police and his fear of his co-defendants. However, the government only introduced two videotaped statements made by appellant at the police station, which would not be affected by Pinkney's proffered testimony regarding earlier events. Moreover, as to appellant's fear of his co-defendants, the testimony would have been cumulative; appellant made clear his fear on the second videotape. Indeed, the evidence of Moctar's guilt was powerful even apart from his videotaped statements.

**6.** In doing so, we were joining "the vast majority of other federal and state courts that have addressed the question." 586 A.2d at 674.

**7.** While, as indicated in the quoted passage, *Boyd* itself did not rule explicitly on any *sua sponte* duty of the court at the trial itself, our subse-

dant having testified, made inquiry of the defendant personally as follows:

THE COURT: First of all, Mr. Moctar, do you understand you have a right to testify. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you also understand that you have a right not to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you realize that in most cases there are good reasons to testify and good reasons not to testify, and that means it's a good idea to talk these things out with your lawyer.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. And do you understand that even though it's a good idea to talk over whether or not you testify with your lawyer, it's ultimately your obligation, your decision as to whether or not to testify, your own personal decision.

Do you understand that?

THE DEFENDANT: I understand that, but my decision on testifying, I haven't come to a decision as yet, and I would like—you said you won't give us no more time, so I guess I would have to go now. I'm saying that I understand what you just said.

THE COURT: Well, do you want to testify?

THE DEFENDANT: I haven't decided, so so far I say no, not yet.

THE COURT: I don't understand you haven't decided.

THE DEFENDANT: Because I was, but I haven't—we haven't really talked about it. We had so much stuff to go over we never had a chance to go over the issue of me testifying or not.

THE COURT: All right. We will go off the record and you can go over with your attorney.

Five minutes now.

(Off the record.)

THE COURT: Okay. Mr. Moctar, have you had an opportunity to talk the matter over with your lawyer?

THE DEFENDANT: Yes, Your Honor. And I would like to say that for those past nine times that we was scheduled to go to trial and we didn't, we didn't go to trial, we were so busy and this time was like cram, cram time, you know. We was busy getting witnesses together, documents together and stuff like that. So we didn't have— we did go over parts of what I was going to testify about, but we didn't fully cover all of my testimony.

And I feel as though if I was to testify, I want to be comfortable testifying, unless I was given more time. So if you won't grant me no more time, I guess I will have to go with the decision of not testifying.

THE COURT: Well, that is a smart ploy, Mr. Moctar, but it's not going to work in my courtroom. You had the entire weekend to go over this, and I doubt that any Court of Appeals is going to tell me I need to give you more than a weekend to think about this mater.

I'm talking now.

THE DEFENDANT: I understand.

THE COURT: I'm talking now. You see, when I talk, you don't talk.

I doubt that any Court of Appeals is going to say that I have to give you more than a weekend. And you had the weekend to think about this and talk about it with your lawyer.

THE DEFENDANT: Right.

THE COURT: You also had numerous breaks today, numerous breaks explicitly to talk to your lawyer. You can build whatever you want into this record, but it ain't going to work.

Are you going to testify? What is your decision? Are you going to testify or aren't you, Mr. Moctar?

THE DEFENDANT: Well, Your Honor—

THE COURT: What is your decision, are you going to testify?

THE DEFENDANT: I guess I won't testify.

THE COURT: I am sorry?

quent cases, cited *infra,* have made clear that no such duty exists.

THE DEFENDANT: I am not going to testify.

THE COURT: Fine. Thank you, sit down.

█ Appellant and the government dispute whether this colloquy constituted a sufficient on-the-record waiver of the right to testify under *Johnson v. Zerbst.* We think this line of argument misconceives the precise question before us; for there is no blanket requirement that the validity of the waiver be determined at trial. As we have made clear in cases following *Boyd,* there is no requirement that at the time of trial, the defendant must make an on-the-record waiver sufficient to satisfy *Johnson v. Zerbst. See Bowman v. United States,* 652 A.2d 64, 74 (D.C.1994); *Woodward v. United States,* 626 A.2d 911, 913–14 (D.C.1993); *Kelly v. United States,* 590 A.2d 1031, 1033 (D.C. 1991).[8] In effect, the failure of the defendant to take the stand in his own defense at trial is, so to speak, treated as a presumed valid waiver of the right to testify. This is not to say, however, that notwithstanding his silence, he may not make a post-verdict challenge to the validity of the waiver.[9]

For the very reason that a defendant might subsequently challenge the validity under *Johnson v. Zerbst* of his apparent waiver by not testifying, *Boyd* stated that it "behooves the trial court to make ... an on-the-record inquiry in order to avoid issues on appeal and collateral attacks." 586 A.2d at 678. This suggestion sought to simplify post-trial motions seeking a new trial on the basis of an inadequate waiver of the right to testify. As a "prophylactic colloquy," *id.* at 679–80 n. 19, *Boyd* advocates, but does not mandate, that trial courts question a nontestifying defendant at trial in order to confirm on

the record at that point that he or she has fully waived the right to testify, and thus to preempt any post-trial challenges to the waiver.

The critical issue before us, to which *Boyd* does not speak, is the scope of the trial court's duty once it heeds *Boyd*'s advice, conducts the colloquy with a non-testifying defendant, and discovers some possible defect in the waiver. The question is whether at that point, in the midst of the trial, the trial court must conduct a full evidentiary hearing to determine indeed whether the waiver is proper or otherwise attempt to resolve the issue such as by a continuance, or whether this determination may await post-trial resolution. Whether or not a more extensive hearing would be required in some cases, we believe that under the circumstances of the present case the trial court did not act improperly in the way it handled the situation.

The *Boyd* colloquy undertaken by the trial court clearly established that appellant was aware of his right to testify and his right not to testify. It also revealed that appellant understood that the ultimate decision about testifying was his alone to make and that he could discuss that decision with his counsel. Appellant clearly knew what his rights were.

The only difficulty presented by the colloquy involves appellant's claim that he could not make a decision about whether to testify because he had not sufficiently discussed the matter with his attorney.[10] Despite its evident incredulity over this assertion based on the numerous opportunities available to appellant over the preceding months to consid-

---

**8.** In *Johnson v. Zerbst,* the court had said that in dealing with the waiver of a fundamental right, "whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." 304 U.S. at 465, 58 S.Ct. 1019. This is done at trial, for example, in the case of a defendant who enters a guilty plea or waives his right to counsel. *Boyd, supra,* 586 A.2d at 675.

**9.** As already noted, *Boyd* rejected the rule of some courts that a defendant must affirmatively demand at trial a right to testify in order to

preserve the argument for a post-trial challenge. *See* 586 A.2d at 677.

**10.** We assume for present purposes, without deciding, that a valid waiver depends upon an appellant's actual acquisition of any necessary information relevant to the waiver decision, as opposed to the opportunity to acquire such information. From the record before it, as the trial court noted, it certainly appeared that appellant had more than ample opportunity to consult fully with his counsel.

er his decision with counsel,[11] the trial court allowed a five-minute pause in the proceedings for the two to confer. After the pause, the court asked appellant whether he had talked the matter over with counsel, to which he responded:

> Yes, Your Honor. And I would like to say that for those past nine times that we was scheduled to go to trial and we didn't, we didn't go to trial, we were so busy and this time was like cram, cram time, you know. We was busy getting witnesses together, documents together and stuff like that. So we didn't have—*we did go over parts of what I was going to testify about, but we didn't fully cover all of my testimony.* And I feel as though if I was to testify, I want to be comfortable testifying, unless I was given more time. So if you won't grant me no more time, I guess I will have to go with the decision of not testifying.

(Emphasis added.) The trial court dismissed these statements as a "smart ploy" by appellant to inject error into the record: "You can build whatever you want into this record, but it ain't going to work."

In upholding the trial court's action here, we do not mean to suggest that there are no circumstances under which the court, based on representations made by a defendant during a *Boyd* colloquy, might not have an obligation to interrupt the trial for a more extensive inquiry into a decision not to testify. Indeed, in *Boyd* itself we held that the trial court in the circumstances there had "a duty to determine whether" the defendant "had made a knowing and intelligent waiver" of her right to testify. 586 A.2d at 677. However, this was premised on the fact that the defendant "made an outburst complaining that she had wanted to testify on her own behalf" so as to make the court aware of that thwarted desire. *Id.* at 671. Equally impor-

tant, the outburst took place after the jury rendered its verdict, and thus the inquiry we required was in the nature of a post-trial motion for a new trial. Recognizing the essentially prophylactic purpose of a *Boyd* inquiry, the advisability of a full-fledged mid-trial evidentiary hearing into the nature of the defendant's decision to testify *vel non,* or other trial-delaying action to resolve the issue, must be a discretionary determination by the trial court, measured against the defendant's assertions and keeping in mind the vital role of the trial court in managing the conduct and pace of the trial.

We do not think that the trial court abused its discretion in requiring a decision of the appellant when it did. A defendant may not dictate the course of trial. Appellant's request for additional time was based solely on a unilateral assertion of lack of sufficient input through defense counsel, despite his concession that he did, in fact, discuss portions of his testimony with counsel. Furthermore, he had already testified extensively once before at a suppression hearing and, in any event, had many opportunities for such discussion to take place, including the weekend immediately preceding the Monday he would have, if he had so chosen, taken the stand. The trial court was understandably incredulous about appellant's assertions given the many opportunities he had to confer with counsel.[12]

The decision whether to testify may be closely related to the entire trial strategy and to the role of trial counsel, matters that may not easily be explored in the context of an ongoing trial where that type of problem is asserted with respect to a waiver. Yet without such an inquiry the legitimacy of appellant's dubious assertion that he needed more time could not fairly be assessed.[13] It

11. Appellant had already testified at length at the suppression hearing. The trial had been scheduled for over four months. The trial itself had been in progress for nearly one week, and appellant and his counsel had the full immediately preceding weekend to discuss the issue, as well as several breaks during the course of Monday.

12. While circumstances might exist where a defendant's decision to testify understandably might be affected by unexpected or uncertain developments during trial, here nothing of that

nature appeared to have occurred on the Monday following the weekend that could have significantly affected appellant's decision. In any event, he made no such assertion to the trial court.

13. Appellant argues that, in a sense, he was making a request for a continuance relating to the most important missing witness of all, namely himself. But this is not a compelling analogy. The potential 'witness was not missing at all; he was right there.

is worth noting that appellant did not make any claim of inadequate representation by his trial counsel. Moreover, the pre-trial inquiry required by *Monroe v. United States*, 389 A.2d 811 (D.C.1978), and *Farrell v. United States*, 391 A.2d 755 (D.C.1978) does not apply once the trial has begun. *See Scott v. United States*, 619 A.2d 917, 922 (D.C.1993). We do not think that *Boyd* aimed to alter, in every case, the manner in which claims of this sort are traditionally adjudicated, namely, through a post-trial motion under Super. Ct.Crim. R. 33 or D.C.Code § 23–110 (1996). *See, e.g., Bowman, supra*, 652 A.2d at 73–74; *Woodward, supra*, 626 A.2d at 914.

In sum, in the circumstances here, we can perceive no abuse of discretion in the trial court's handling of this *Boyd* issue. Given all these circumstances, the trial court could insist upon a decision when it did on whether the appellant was going to testify.

### III. Suppression of Appellant's Statements

██ The police had difficulty apprehending Moctar. However, they managed to get a note to him representing that if he came in to talk with them, he would not be arrested. In response thereto, Moctar came to the police [14] and was arrested. He was properly advised of his *Miranda* rights. Eventually he gave two videotaped statements.

██ Moctar challenges the motion court's decision to deny his motion to suppress those statements, claiming that they were not voluntary, contrary to the finding of the court. We review the ultimate legal issue of voluntariness of a statement de novo, *see Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); however, the underlying factual findings are reviewed under the clearly erroneous standard, *see Hebron v. United States*, 625 A.2d 884, 885 (D.C.1993). The facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling. *See Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc).

██ Appellant in essence argues that both the *Miranda* waiver and the statements themselves were rendered involuntary by the effect of the ruse by which he had been induced to come to the police. On such a claim, "the test is whether, under the totality of the circumstances, the will of [the defendant] was overborne in such a way as to render his confession the produc[t] of coercion." *McIntyre v. United States*, 634 A.2d 940, 944 (D.C.1993) (internal quotation marks omitted). But the use of deception or trickery by the police does not render an otherwise voluntary confession invalid "as long as the means employed are not calculated to produce an untrue statement." *See Beasley v. United States*, 512 A.2d 1007, 1015–16 (D.C.1986) (internal quotation marks omitted).

We agree with the trial court that the means by which Moctar was induced to come to the police did not make either the *Miranda* waiver or the statements themselves involuntary. Appellant was unequivocally informed upon his arrival that he was under arrest. When he signed the *Miranda* waiver stating that he was a "witness," he was again told that he was in fact a defendant. Although subsequently appellant made comments indicating he hoped to go home, nothing the police did vitiated their continual assertions of appellant's status as one under arrest.

The trial court concluded that "there is absolutely nothing on this record that would suggest the act of sending that note and [appellant's] responding to it in any way overcame his free will and ability to make a conscious and knowing decision whether or whether not to make any statements to the police." We see no basis to find any fault with this conclusion.

As in *Green, supra*, 718 A.2d at 1062–63, certain of appellant's convictions merge, and the case therefore is remanded for the sole purpose of permitting the trial court to vacate duplicative convictions and to resen-

---

14. More precisely, Moctar first went to the United States Attorney's office and from there was escorted to the Homicide Branch.

tence. In all other respects, the judgment appealed from is

*Affirmed.*