**UNITED STATES, Appellant,**

v.

**Darryl TURNER, Appellee.**

**No. 99–CO–1573.**

District of Columbia Court of Appeals.

Argued June 29, 2000.

Decided Nov. 9, 2000.

Ann K.H. Simon, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Julie A. Grohovsky, Assistant United States Attorneys, were on the brief, for appellant.

Corinne Beckwith, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellee.

Before STEADMAN, GLICKMAN, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

On August 19, 1998, a grand jury indicted appellee, Darryl Turner, on two counts of armed first-degree sexual abuse pertaining to Vera Duncan,[1] one count of first-degree sexual abuse and two counts of first-degree premeditated and felony murder pertaining to Jacqueline Birch,[2] one count of first-degree sexual abuse and two counts of first-degree premeditated murder pertaining to Dana Hill,[3] and two counts of first-degree sexual abuse pertaining to Brenda Williams.[4] On August 5, 1999, Turner filed a motion with the trial court to suppress tangible evidence, identifications, and statements that had been made at the Federal Bureau of Investigation ("F.B.I.") field office in Washington, D.C. on December 10, 1997. These statements were made in response to police questioning after Turner was informed that the officers had a search warrant authorizing them to take samples of his blood, saliva, and head and pubic hair. On November 4, 1999, the trial court granted the motion in part. The government filed this timely appeal. The issues on appeal are: (1) whether a murder suspect who voluntarily accompanies the police to the F.B.I. building for investigative questioning is placed in "custody" for purposes of *Miranda*,[5] when the police announce during the questioning that they have and will immediately execute a search warrant for evidence secreted in the suspect's body, and then continue questioning the suspect while the search is conducted; and (2) even if the suspect was in "custody" and his *Miranda* rights were violated, whether the statements were voluntarily made so that they may be used for impeachment purposes. Because we find that the trial court correctly determined that a search warrant for hair and bodily fluids, executed in a police dominated environment, creates a restraint on the freedom of one's movements of a degree associated with formal arrest, we affirm the trial court's ruling that statements made by Turner in response to police questioning after the warrant was revealed, should be suppressed. However, on this record, we cannot conclude that Turner's statements

---

1. D.C.Code §§ 22–3202, –4102 (1995 Supp.).

2. D.C.Code §§ 22–2401, –4102.

3. D.C.Code §§ 22–2401, –4102.

4. D.C.Code § 22–4102.

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

were involuntary. Therefore, we affirm in part and reverse in part.

## I.

At the motions hearing, Metropolitan Police Department Detective Daniel Whalen testified that on May 8, 1997, the dead body of Latesha Blocker was discovered in an abandoned building located at 766 Princeton Street, N.W., next door to Turner's home. On August 9, 1997, the dead body of Emily Dennis was discovered in a crawl space under Turner's apartment. As a consequence of these deaths, an intensive, door-to-door police investigation commenced in the neighborhood, and many residents were interviewed.

On November 18, 1997, the dead body of Jacqueline Birch was discovered in the same abandoned building in which Ms. Blocker's body had earlier been found. Detective Whalen learned that Turner was with Ms. Birch in his home approximately thirty-eight hours before her death, and this was the last time she was seen alive. Additionally, because Turner was known to be acquainted with the three women, Detective Whalen obtained a search warrant for his home, which he executed on November 25, 1997. Turner was not home, but upon request, Mrs. Turner accompanied Detective Whalen to police headquarters to give a statement. Turner arrived at the police station looking for his wife, and Detective Whalen asked Turner to give a statement. Turner agreed. In response to questions, Turner said that he had never seen any of the women, that anyone who said otherwise would be lying, and that anyone who said he was outside of his home socializing on Sunday, November 16th, would be lying.

On December 1, 1997, the dead body of Dana Hill was discovered in a vacant building located on Florida Avenue. Hill, who had family ties in the Princeton Street neighborhood, appeared to have been sexually assaulted before she died. On December 9, 1997, Detective Whalen obtained a search warrant authorizing the collection of blood, saliva, and head and pubic hair samples from Turner.

The statements at issue in this appeal occurred on December 10, 1997. Turner was located by Detective Whalen who told him that he had several additional questions regarding the deaths, and asked Turner if he was willing to accompany the officers. Turner responded that he was willing to accompany the officers. Detective Whalen then advised Turner that he was not under arrest and that, upon completion of their interview, he would take Turner to the destination of his choice. Detective Whalen stated that Turner went with the officers willingly, but if Turner "had not wanted to comply I certainly . . . would have taken some measures to take him into temporary custody." Detective Whalen drove Turner and the three other officers in his uncaged police vehicle to the Washington Field Office of the F.B.I. ("WFO"), a facility that Detective Whalen described as a "secure building." Turner was not restrained in any way.

Turner was taken into the nurses' station. Detective Whalen, prior to telling Turner that he had a search warrant for his body, asked him in the presence of the other three officers "if there was anything else[,] or anything in his earlier statement that he wanted to change[,] or anything additional he wanted to tell me." Turner said "no," and that "he stood by what he had said earlier." Detective Whalen told Turner about Hill and asked him if he had had "any contact with Ms. Hill, knew of her, [or] had any kind of sexual activity with her." Turner told Detective Whalen that he had heard of her death, but did not know her nor had sexual contact with her. Detective Whalen told Turner that tests were being conducted on the women and that if anything were found, he would have to explain it. Turner said he understood.

At the end of their conversation, Detective Whalen advised Turner that he had a search warrant for bodily fluids, hair, and saliva. Detective Whalen told Turner that the warrant was signed by a Superior Court judge, that it ordered him to provide the samples, and that he was required to

comply with the order. Detective Whalen further stated that because Turner never resisted, he never had to "raise the stakes any and tell [Turner] that he couldn't go. It never became an issue." The record indicates that the only time Detective Whalen pledged to take Turner to the location of his choice after the interrogation was when he initially picked Turner up earlier that day.

Turner was told by Detective Whalen that the purpose of obtaining the samples was to permit comparison with any evidence found on the bodies of the dead women. When Detective Whalen asked Turner if he understood the significance of this comparison, Turner replied, "[Y]es, I do." Detective Whalen then asked Turner, "[Is] there anything you want to change or tell me[,] that you were, you know, you were with any of these women." According to Whalen, Turner said, "[N]o, I'm not changing anything[.] I wasn't with any of them." Detective Whalen told him to "speak now or forever hold [his] peace," and Turner stated, "[N]o, I stick by what I'm saying."[6] At that point, the samples of Turner's saliva, head hair, and blood were taken with the assistance of a nurse and in the presence of three other officers.

Turner was left alone with Detective Whalen when pubic hair samples were taken to afford him privacy and was asked again if there was anything he wanted to say. Detective Whalen assured Turner that he did not ask about any such encounters to embarrass him and that any information Turner provided would not be shared with his wife. Turner was cau-

tioned that if anything were found on the women, or if his DNA matched evidence found on either of the women's bodies, his denial of having known them or having had sexual relations with either of them could have serious repercussions. Turner said that "he understood this[,] and that he stood by his account that he did not know any of them and had not been with any of them."

After the search warrant was fully executed and the samples of Turner's blood, saliva, and head and pubic hair were taken, Detective Whalen informed Turner that he had obtained what the court requested, the procedure was over, and that he would take Turner to the place of his choosing. Detective Whalen testified that he was with Turner that day for about an hour and that the execution of the search warrant took between five and ten minutes. At no time was Turner handcuffed or otherwise restrained. Turner was not arrested until January 29, 1998, more than seven weeks after the search warrant was conducted and after evidence obtained on the bodies of the two women was found to match the samples taken from his body.

The trial court ruled that the statements made by Turner after he was informed of the search warrant for his bodily fluids and hair must be suppressed under *Miranda*. The trial court reasoned that Turner was in custody when the police executed the search warrant for his bodily fluids and that "therefore ... *Miranda* is necessary under those circumstances." The trial judge also concluded that under the facts of this case, the statement was invol-

---

6. There is a discrepancy within the record between Detective Whalen's testimony on direct and cross-examination with respect to the order in which these events occurred. On direct examination, Detective Whalen's testimony suggested that it was after Turner was informed about the search warrant that he made statements reiterating his previous denial that he had been with any of the women, stating that he did not want to change anything in the previous statements and expressing his understanding of the significance of the samples that would be taken from his

body. On cross-examination, Detective Whalen suggested that he did not inform Turner of the search warrant until after Turner indicated that he understood he would need to explain "anything ... found on him" and that he did not want to change his story. Whether these statements were actually made before or after Whalen informed Turner of the existence of the search warrant, the government indicates in its brief that it assumes that they fall within the scope of the trial court's suppression order.

untary because of the coercive atmosphere surrounding the execution of the search warrant.

## II.

### A. Custody

The government first contends that the trial court erred in suppressing challenged statements made by Turner after he was informed of the search warrant, because he was not in "custody" when the statements were made. On appeal from the trial court's grant of a motion to suppress statements on *Miranda* grounds, our role is to ensure that the trial court had a substantial basis for concluding that a constitutional violation had occurred. *See Goldston v. United States*, 562 A.2d 96, 98 (D.C.1989). The trial judge's determination that Turner was in "custody" when he made the statements and that his *Miranda* rights were violated is ultimately a conclusion of law that we review *de novo*. *See Reid v. United States*, 581 A.2d 359, 363 (D.C.1990). *Accord, e.g., Patton v. United States*, 633 A.2d 800, 814 (D.C.1993); *Thompson v. Keohane*, 516 U.S. 99, 102, 113, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). This court's review of the resolution of a motion to suppress evidence is limited. We will not disturb the trial court's factual findings unless they are "clearly erroneous," and those findings "will only be set aside if they lack substantial support in the record." *See Morris v. United States*, 728 A.2d 1210, 1215 (D.C.1999). *See, e.g., Hawkins v. United States*, 461 A.2d 1025, 1030 n. 6 (D.C.1983), *cert. denied*, 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984). Finally, we review the record in the light most favorable to the party that prevailed in the trial court, and we must sustain any reasonable inference that the trial judge has drawn from the evidence. *See, e.g., Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc); *Morris*, 728 A.2d at 1215; *Jones v. United States*, 747 A.2d 558, 562 (D.C.1999).

The trial court found that Turner was in police custody at the point when Detective Whalen executed the search warrant upon him. Therefore, any statements made from that point on were inadmissible because he was not advised of his *Miranda* rights. The government contends, however, that Turner was not in "custody," but rather was "seized" for Fourth Amendment purposes and thus did not need to be advised of his *Miranda* rights.

The Fifth Amendment of the U.S. Constitution states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." The Supreme Court's ruling in *Miranda* established the means of safeguarding this privilege against compelled self-incrimination in the context of custodial police interrogation. 384 U.S. at 457, 86 S.Ct. 1602; *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 2334, 147 L.Ed.2d 405 (2000) (stating that the *Miranda* Court invited "action to protect the constitutional right against coerced self-incrimination"). The purpose of the *Miranda* protection is to "ensure that the police do not coerce or trick captive suspects into confessing, to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist...." *Berkemer v. McCarty*, 468 U.S. 420, 421, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

The government argues that the execution of the search warrant did not change what in essence had been a voluntary discussion with Turner into "custodial interrogation," but rather that the search warrant acted merely to "seize" Turner for a brief period of time. In general, the issue of "custody" for purposes of *Miranda* has been the subject of many legal decisions, because "Miranda creates as many close questions as it resolves [and thus] [t]he task of determining whether a defendant is in 'custody' has proved to be 'a slippery one.'" *Withrow v. Williams*, 507 U.S. 680, 711–12, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (O'Connor, J., concurring in part and dissenting in part).

■ On a fundamental level, "seizure" and "custody" are not synonymous. *See Patton*, 633 A.2d at 815 n. 7 (stating that although language used by this court has equated a Fourth Amendment "seizure" with a Fifth Amendment "custody[,]" the Supreme Court has made clear that the two concepts are not synonymous). "A seizure occurs when the police have by word or conduct manifested to the suspect that he is not free to leave, and in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 814. Custody is clearly more than seizure alone. *See Harris v. United States*, 738 A.2d 269, 275 (D.C.1999). The Supreme Court stated that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken away into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The Supreme Court subsequently refined the definition of custody as it pertains to custodial interrogation by framing the factual issue as "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Berkemer*, 468 U.S. at 439–40, 104 S.Ct. 3138; *see also Morris*, 728 A.2d at 1216; *Patton*, 633 A.2d at 815 n. 7; *In re E.A.H.*, 612 A.2d 836, 838 (D.C.1992) (quoting *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517).

■ The test for determining whether a person is in custody is an objective one and focuses upon "how a reasonable [person][7] in the suspect's position would have understood [his or her] situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138. The "inquiry is based [upon looking at] the totality of the circumstances." *See Patton*, 633 A.2d at 814; *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Beckwith v. United States*, 425 U.S. 341, 346–47, 96 S.Ct. 1612,

48 L.Ed.2d 1 (1976); *State v. Willis*, 145 Vt. 459, 494 A.2d 108, 117 (1985) (noting that the inquiry is an objective one, and the trial court must consider all the surrounding circumstances). Further, the court's examination of the "totality of the circumstances" must be "informed by the underlying purpose of the *Miranda* rule, namely to protect individuals from compelled self-incrimination." *See Sprosty v. Buchler*, 79 F.3d 635, 640 (7th Cir.) (citing *Berkemer*, 468 U.S. at 433, 104 S.Ct. 3138), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 95 (1996).

In order to determine whether the police questioning of Turner amounted to custodial interrogation, we must determine whether the circumstances presented in this case, as well as the events surrounding the execution of the search warrant, lead to the conclusion that Turner was restrained in his movement to "the degree associated with a formal arrest." *See E.A.H.*, 612 A.2d at 838.

The government principally relies on this court's opinion in *E.A.H.*, to support their contention that Turner's seizure during the execution of the search warrant did not rise to the level of a custodial detention and thus, *Miranda* warnings were not required. In *E.A.H.*, we held that the defendant was not considered to be in custody when a search warrant was being executed on his home, even though he was compelled to remain on the premises while answering police questioning. "[T]his court has twice rejected the notion that a person was in custody for *Miranda* purposes because he was questioned during the execution of a search warrant in his home, even though he was not free to leave." *Id.* at 838 (citing *Tyler v. United States*, 298 A.2d 224, 226–27 & n. 4 (D.C. 1972); *Wells v. United States*, 281 A.2d 226, 228 (D.C.1971)).

The government argues that Turner's situation is factually similar to that of *E.A.H.*, because Turner, like E.A.H. was

---

7. "[T]he reasonable person test presupposes an innocent person." *See Florida v. Bostick*,

501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

compelled to remain at a certain location while a search warrant was being executed. We find Turner's situation, however, to be factually distinguishable from *E.A.H.* in two important respects. First, E.A.H. was being restrained in a room in his home while the search warrant was being executed. He was not, like Turner, being restrained in a law enforcement building, and the situs of the police questioning was a critical factor in our reaching the conclusion that "the restraint on [E.A.H.'s] liberty during the brief questioning in a room in his home with the door open, did not approach a level comparable to that of a formal arrest." *E.A.H.* 612 A.2d at 839 (stating further that E.A.H. knew that it was unlikely that he was going to be arrested since his half-brother, who was interviewed before him, was not arrested). Second, the search warrant in *E.A.H.* was for weapons allegedly located in the house where he resided. In this case, Turner was faced with a search warrant that required him to surrender his body for the collection of his blood, saliva, and head and pubic hair. Although Turner, like E.A.H., was not allowed to leave nor was sure when he would be able to leave, Turner, unlike E.A.H., was detained in an unfamiliar police dominated environment being subjected to interrogation while undergoing invasive procedures upon his person.

For purposes of *Miranda,* station house detentions are viewed in a different light than typical *Terry* seizures on the street. *See generally Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138, Justice Marshall, writing the opinion for the Supreme Court, drew a sharp distinction between those circumstances where an interrogation is exposed to public view, such as a traffic stop or other circumstance where the ability of the unscrupulous policeman to use illegitimate means to elicit self-incriminating statements is reduced, and those circumstances where interrogations take place in "police dominated surroundings" similar to the interrogation at issue in *Miranda.* In fact, in *Berkemer,* the Supreme Court held that station house

interrogations are the standard against which all potentially custodial situations are to be measured. 468 U.S. at 438, 104 S.Ct. 3138. Although the government argues that this questioning took place in a nurses' station at the F.B.I. field office and not in a typical police station interrogation room, such distinctions are at best arbitrary when what most concerns the court is police dominated questioning that is away from the public view. Police questioning of a suspect in an F.B.I. building or in any police facility, regardless of where within the building or facility the questioning takes place, raises significant concerns for which *Miranda* warnings are an appropriate prophylactic against compelled self-incrimination.

■ In this case, Turner voluntarily accompanied several police officers to an F.B.I. field office after being told that he would be released at the end of the conversation and taken anywhere he wanted to go. At that point, Turner was engaged in a process that was somewhat familiar to him as he had previously been questioned about the homicides by police officers in a police station and released. However, upon being informed that the police officers had a warrant, signed by a judge, compelling him to submit to an invasive procedure to secure hair samples and bodily fluids, Turner could fairly perceive that his situation had changed dramatically and that he was probably not free to leave. The existence of a search warrant for one's body, as opposed to one's home or for one's belongings, is the type of formality that a layperson might reasonably view as having all the indicia of a formal arrest regardless of police pronouncements to the contrary. This is especially true where it is clear that the person subject to the warrant would be restrained if they tried to leave.

Contrary to the government, we find Turner's situation more analogous to the defendant's situation in *United States v. Gayden,* 492 A.2d 868 (D.C.1985), than to *E.A.H..* In *Gayden,* the defendant was in-

terrogated by the police, at the police station, without being advised of his *Miranda* rights. The police advised Gayden that he was free to leave at any time, and during that time, he made three statements. Before Gayden made his third statement, he was confronted by the officers who claimed that his statements were contradictory. The trial court found that the defendant was in custody when he made the third statement. We agreed, citing to the trial court's memorandum, and holding that the police interrogation was done in "such a manner as to imply that Gayden's situation had changed so significantly that he was no longer free to go." 492 A.2d at 873.

As in *Gayden*, Turner understood that the circumstances surrounding his situation had changed after being advised of the search warrant. When Turner was initially picked up, Detective Whalen told him that he had a few questions for him, that he was not under arrest, and that afterwards he would be taken to a place of his choosing. However, once Detective Whalen advised Turner of the search warrant, Turner was no longer free to leave, but rather, was compelled to comply with the order. Therefore, in light of the totality of the circumstances, the trial court correctly determined that Turner was in custody when he was served with the search warrant because a reasonable person in Turner's position would feel "there was a restraint on [his] freedom of movement of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517. Accordingly, the trial court correctly ruled that because of the *Miranda* violation, the challenged statements could not be used in the government's case in chief.

### B. Voluntariness

■■■■ The government also argues that the trial court erred in finding that Turner's statements, after being served with the search warrant, were involuntary. The government contends that even if Turner was in "custody" for *Miranda* purposes, his statements were nevertheless voluntary and thus can be used for im-

peachment purposes. With respect to the voluntariness of Turner's statements, the government has the burden of proving that the statements were voluntarily given. *See Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Davis v. United States*, 724 A.2d 1163, 1168 (D.C. 1998). This court applies a *de novo* standard of review to the legal determination regarding voluntariness and reviews for clear error the factual findings supporting that determination. *See Moctar v. United States*, 718 A.2d 1063, 1070 (D.C.1998). "The facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." *Id.*

■■■■ Although an involuntary statement is inadmissible at trial for any purpose, *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *United States v. Carignan*, 342 U.S. 36, 38, 72 S.Ct. 97, 96 L.Ed. 48 (1951), voluntary statements are admissible to impeach a defendant's trial testimony even if taken in violation of *Miranda's* prescriptions. *See Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (stating that voluntary statements inadmissible in the prosecutor's case-in-chief because of *Miranda* violations may be used nonetheless to impeach a defendant's credibility, "provided of course that the trustworthiness of the evidence satisfies legal standards"). The reason for this limitation of the exclusionary rule is "to prevent a defendant from turning the *Miranda* shield against illegal police methods into a license to commit perjury." *See Barrera v. United States*, 599 A.2d 1119, 1128 (D.C.1991). Thus, otherwise inadmissible statements are admitted as part of the impeachment process because "the inconsistency between the [defendant's] testimony and the prior statement merely [gives] the jury a means of assessing the [defendant's] credibility." *See Martinez v. United States*, 566 A.2d 1049, 1058 (D.C.1989). However to admit such statements, the government must first show that the defendant's statements were voluntary. *See, e.g., New Jer-*

*sey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona,* 437 U.S. 385, 401–02, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

■ The test for determining the voluntariness of specific statements "is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "The government must prove, by a preponderance of the evidence, that the confession was voluntary." *Bliss v. United States,* 445 A.2d 625, 630 (citing *Lego,* 404 U.S. at 489, 92 S.Ct. 619). "Generally, the factors for consideration in determining voluntariness include the circumstances surrounding the questioning, the accused's age, education, and prior experience with the law, his physical and mental condition at the time the statement was made, other factors showing coercion or trickery, and the delay between the suspect's arrest and confession." *Davis,* 724 A.2d at 1168; *see also Beasley v. United States,* 512 A.2d 1007, 1015 (D.C.1986) (adding among the factors "duration of the questioning, and any allegations of physical coercion [ ], or promises of leniency"). Although the trial judge predicates her decision upon the fact that Turner was in custody and detained pursuant to a search warrant, it has been established that custodial interrogation is insufficient to make a statement involuntary. *See, e.g., United States v. Bell,* 740 A.2d 958, 962 (1999); *Martinez,* 566 A.2d at 1058–59 (holding that detention pursuant to a search warrant is insufficient to make subsequent statements involuntary).

■ In considering the totality of the circumstances, we cannot agree with the trial court that Turner's will was overborne merely because the police officers surprised him with the search warrant and placed him in an uncomfortable situation. To expand our involuntariness jurisprudence to encompass the kind of conduct complained of here on the part of the police officers would be inconsistent with prior controlling decisions where the Supreme Court has held that in order for statements to be involuntary they must have been procured through some form of trickery or by the use of mental or physical tactics designed to coerce or compel a statement from an individual. *See, e.g., Mincey,* 437 U.S. at 399, 98 S.Ct. 2408 (holding defendant's statements involuntary when made while "encumbered by tubes, needles, and breathing apparatus" and complaining of "unbearable" pain); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (holding defendant's statements involuntary when made pursuant to continuous and persistent questioning for eight hours where defendant repeatedly was denied counsel and rest); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) (holding defendant's statements involuntary when subjected to eight hours of intense interrogation in a small, crowded room despite officer's knowledge that suspect had mental problems); *Payne v. Arkansas,* 356 U.S. 560, 561, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (holding involuntariness of statements when officer told defendant that if he confessed he would protect him from the outside mob). While it may be argued that withholding information about the existence of the search warrant was trickery, there is no evidence that Turner was so affected by the revelation that it led him to make statements against his will. In fact, Turner was very consistent in his statements to the police both before and after the warrant was revealed to him. All that Turner was doing here was reasserting the accuracy of his prior statements. The overwhelming evidence in this case reflects that the three suppressed statements were voluntarily made. Detective Whalen had not engaged in any oppressive or overreaching conduct. The circumstances surrounding the execution of the search warrant and the subsequent questioning of Turner fall short of the abuse and coercion necessary to exclude

an inconsistent statement because of involuntariness. Detective Whalen's advice to Turner that the search warrant would be used to determine if his DNA matched that found on the women also "do[es] not, in the circumstances here, rise to the violation of the constitutional command that no person 'shall be compelled in a criminal case to be a witness against himself.'" *United States v. Thomas*, 595 A.2d 980, 982–83 (D.C.1991).

■ Turner argues that in addition to the surprise factor, the fact that he was being questioned while the search warrant for his body was being executed, including the period of time when he was in the embarrassing position of allowing someone to obtain samples of his pubic hair, is sufficient evidence upon which to conclude that any statements made by him were involuntary. However, Turner never contended nor offered evidence that the circumstances surrounding the execution of the search warrant caused him discomfort. In any event, any embarrassment that Turner had is insufficient to make his statements involuntary. *See Barrera*, 599 A.2d at 1129 (holding that Barrera's statements were not involuntary even though he made them while he was handcuffed and subjected to a search of his genital area at police headquarters). At the time of this interrogation, Turner was thirty-four years old. There is no evidence in the record that he suffered any mental or physical impairment. There is no evidence that he was tricked into making any statements to the police or that he was subjected to physical or mental coercion while he was being questioned at the FBI field office. Turner was never made promises of leniency, the search took place immediately after Turner was told of the warrant, and the entire period of questioning after the warrant was served took less than ten minutes.

Furthermore, Turner knew Detective Whalen from a prior interview from which he had emerged a free man. When he was picked up for questioning the second time, Detective Whalen advised Turner that he was not under arrest, and Turner voluntarily agreed to answer additional questions for the detective although it is unclear whether Tuner was aware that the questioning would take place in a law enforcement facility. Additionally, Turner had voluntarily answered similar questions immediately before the warrant was announced. He was not accused of a crime nor confronted with any criminal evidence linking him to a crime. Therefore, we cannot conclude that Turner's statements were given involuntarily while the search warrant was executed. Although the statements are in violation of *Miranda* and cannot be used in the government's case-in-chief, they are admissible for impeachment purposes.[8]

*So ordered.*

---

8. Turner argues that his statements should be suppressed as involuntary because Detective Whalen failed to advise him that he was free to leave during the period of time when the warrant was being executed. This court has stated that "[w]hether a person has been told he or she is free to leave, besides bearing directly on the issue of custodial interrogation, may be a factor in the voluntariness determination." *Thomas*, 595 A.2d at 982. On the facts of this case, however, and for the reasons previously cited, we find that Detective Whalen's testimony that he would not have allowed Turner to leave until the warrant was executed is material only to the question of custody. There is nothing in the record from which we can glean any coercion from the fact that Turner was told before and after execution of the warrant that he was free to leave but was not told that during the execution of the warrant.