928 A.2d 643 (2007)
In re J.H., Appellant.
No. 02-FS-1084.
District of Columbia Court of Appeals.
Argued April 4, 2006.
Decided July 12, 2007.
*645 David Norman, Public Defender Service, with whom James Klein, Samia Fam, and Andrea Roth, Public Defender Service, were on the brief, for appellant.
Sidney R. Bixler, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General at the time, Edward E. Schwab, Deputy Attorney General, and Rosalyn Calbert Groce, Chief, Juvenile and Criminal Section, were on the brief, for appellee.
Before GLICKMAN and FISHER, Associate Judges, and STEADMAN, Senior Judge.
PER CURIAM[*]:
Appellant, who was twelve years old at the time, was interrogated by a police officer at his school and confessed to a sexual offense involving his three-year-old sister. No Miranda[1] warnings were given by the police officer. Concluding that appellant had not been in "custody," the trial court declined to suppress the confession, which constituted the primary evidence against the youth. Applying the proper standard of review to the record presented, "we cannot conclude as a matter of law that [appellant] was in custody when the police interrogated [him], i.e., that [his] freedom of action was curtailed to a degree associated with a formal arrest." Morales v. United States, 866 A.2d 67, 74 (D.C. 2005). We therefore uphold the trial court's denial of the motion to suppress. We also conclude that the confession was adequately corroborated.

I.
One day in the fall of 2001, R.H. left her twelve-year-old son, J., and his three-year-old sister, U., alone in the family home for several hours. Approximately thirty minutes after R.H. returned, U. told her mother, "I seen J.'s peter meat."[2] R.H. testified that "[she] asked her what did he do with it" and that "she said he put it in her mouth."
R.H. confronted J., who was in the bedroom across from the bathroom where U. *646 and her mother were talking.[3] R.H. asked J., "what happened." R.H. testified that, "Before I could even get that out, he was like, I didn't do it, I didn't do it." R.H. returned to the bathroom, closed the door and asked U. again what had happened and received the same response. R.H. left the bathroom and found J. in the living room. She "hit him because [she] was angry at him for what he had done, for what [U.] had told [her] he had done." R.H. called the police, then left with U. and went to a neighbor's house. Before R.H. left, J. told her he would wait in the house until the police arrived. Instead, while at the neighbor's house, R.H. heard her door slam and saw J. running up the street. He was found later that evening asleep in the hallway outside his maternal grandmother's home.[4]
In response to R.H.'s call to the police, Investigator Henry Gerald[5] came to R.H.'s home and interviewed R.H. and U., who told him that J. had caused U. to suck on his penis. Investigator Gerald informed R.H. that a medical examination was standard protocol in an abuse case, and Gerald took R.H. and U. to Children's National Medical Center for an examination.
At the hospital, U. was examined by Dr. Amy Pierce, a pediatric associate, who asked U. and R.H. what had brought them to the emergency room. R.H. answered the question, telling Dr. Pierce that "U. had told [R.H.] that [U.'s] 12-year-old brother had put his penis in [U.'s] mouth." Dr. Pierce's examination of U. revealed no bruising or other physical evidence of assault, though, under the circumstances, Dr. Pierce did not expect to find any such evidence.
Approximately six weeks after this incident, Investigator Gerald, with the permission of J.'s grandmother, went to J.'s school to interview him.[6] Investigator Gerald was dressed in street clothes but wore his police identification on a chain around his neck. He wore a holstered gun on his right hip but demonstrated to the trial judge during his testimony that the gun would not have been visible to J. because his suit jacket and overcoat covered it.
It is not clear from the testimony how J. was summoned or brought to the room where he was interviewed.[7] Investigator Gerald met him in the hallway outside the principal's office, and the three individuals (J., Investigator Gerald, and the principal) walked across the hall to the large room where the interview took place. The principal quickly left without saying anything.
The interview room was large  about the size of a Superior Court courtroom, which the court estimated would be about 30 feet by 50 feet. As the court summarized the testimony, the room looked "a little bit like a library in the sense that it *647 had a wall of windows, some books along one wall, a lot of photographs hanging on the wall, and a very large . . . conference table in the middle of the room." The only door to the room was closed but not locked.
Investigator Gerald introduced himself as an investigator for the police department and told J. that he wanted to discuss "an incident that occurred between him and his sister." J. was not restrained in any way. For the first ten or fifteen minutes, they walked around the room, looking at the pictures and discussing sports and a variety of things. Investigator Gerald did not say anything "one way or another" about whether J. could leave, and "J.H. never asked if he could leave." Gerald did not raise his voice. He made no threats or promises.
When they began discussing the offense, Investigator Gerald sat down at the conference table and invited J. to sit wherever he would like. The table was about four feet wide and fifteen to eighteen feet in length, and J. sat across from the officer, about four feet away. They were both at the end of the table nearest the door. Investigator Gerald asked J. if he knew the difference between the truth and a lie and told him it was important to tell the truth. J. responded that "he thought he was going to tell the truth." J. initially said that he was babysitting his sister and she was in the bathroom washing her hands. J. said he needed to use the toilet, so he went in the bathroom and told his sister to get out. She did not leave. While he was using the toilet, his sister saw his penis.
Investigator Gerald briefly changed the subject, but then asked J. to tell him again what had happened. In the second version of the events, everything was the same except that J. said while he was using the toilet, his sister came over and touched his penis. Investigator Gerald pointed out to J. that his story had changed during the second version. At this point, Investigator Gerald noticed a change in J.'s demeanor. J. stopped looking at Investigator Gerald directly and started to look down with an embarrassed expression. Investigator Gerald reminded J. that he needed to tell the truth and that the investigator needed to know exactly what happened. J. then stated that he went into the bathroom to use the toilet and he told his sister to come over and touch his penis "[a]nd then she sucked on it for a couple of seconds." Investigator Gerald then asked J. to write down his statement and sign and date it. J. wrote, in part, ". . . I used the bathroom and she touch my penis and I told her to suck it and she did it for a couple of sec[o]nds. . . ." After receiving the written statement, Investigator Gerald asked J. if he had any questions. He did not, so Gerald said, "Okay, let's go now. We can leave and we'll go back to the principal's office and we'll make sure you get back to your classroom." They walked to the principal's office and Investigator Gerald left. Approximately forty or fifty minutes had elapsed since the two individuals had met in the hallway, but they spent only twenty-five or thirty minutes discussing the offense.
After the interview with J. at the school, Investigator Gerald telephoned J.'s grandmother and told her that J. had admitted committing the offense. Later that evening, J.'s grandmother asked J. about his interview with Investigator Gerald and J. told her, "I did it." J.'s grandmother telephoned R.H. and put J. on the phone. R.H. asked J., "why did you do it?" and he replied, "I just wanted to know how it felt."
The next day, the District of Columbia filed a petition charging appellant with first degree child sexual abuse, D.C.Code *648 § 22-3008 (2001), against his sister, U.[8] A hearing was held before the trial court over the course of several days in March and April 2002. Appellant was found "involved" and placed on probation for one year. This timely appeal followed.

II.
Appellant asserts that the trial court committed reversible error when it denied appellant's motion to suppress his written confession on the ground that he was not in custody for Miranda purposes. "[W]e review the record in the light most favorable to the party that prevailed in the trial court, and we must sustain any reasonable inference that the trial judge has drawn from the evidence." United States v. Turner, 761 A.2d 845, 850 (D.C.2000). Moreover, "[w]e will not disturb the trial court's factual findings unless they are `clearly erroneous'. . . ." Id. Although we review the record in this deferential manner, the trial court's determination that J. was not "in custody" for purposes of Miranda "is ultimately a conclusion of law that we review de novo." Id.
"An individual is in custody for Miranda purposes only where there is `a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Morales, 866 A.2d at 71 (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (internal quotation marks omitted)). Accord, In re I.J., 906 A.2d 249, 255 (D.C.2006). The test is an objective one that considers the totality of the circumstances from the viewpoint of a reasonable person. Turner, 761 A.2d at 851. This inquiry "must be informed by the underlying purpose of the Miranda rule, namely to protect individuals from compelled self-incrimination." In re I.J., 906 A.2d at 256 (citation omitted).
There are obvious similarities between this case and In re I.J., which appellant asserts is "virtually dispositive," but that decision does not dictate the outcome of this appeal. Instead, we must apply the governing legal principles to the totality of the circumstances presented. Here, the record, and our standard of review, lead us to a different result.
In I.J., we were dealing with a significantly different set of surrounding circumstances. Although we found cases dealing with interrogations in a school setting to be "analogous" and "helpful," id. at 262, we were not called upon to decide a "school" case. We ultimately relied upon "several factors" in upholding the trial court's ruling that I.J. had been in custody at the time of the interrogation.
In I.J., the police had been summoned to the Kennedy Youth Center, where I.J., a sixteen-year-old male, resided pursuant to court order pending revocation of his probation. Earlier that morning members of the staff had found two vials of a green, leafy substance under I.J.'s bed. When confronted, I.J. exclaimed, "damn, got my loot!" A staff member called 911, reporting that they were detaining one of their residents because they had found "what they suspected to be marijuana among his possessions. . . . The staff of the center then placed [I.J.] in a small office adjacent to the entry hall. . . . [I.J.] remained in this room until Officer Minor arrived." 906 A.2d at 252. After conferring with a counselor, the uniformed officer entered the twelve by fourteen foot room, paused, *649 looked down at the two vials of marijuana, and asked I.J. "What happened?" Id. I.J. responded with an admission of guilt, and, after a test confirmed that the vials contained marijuana, the officer arrested him. The trial court ruled that I.J. was in custody and it suppressed the statement because no Miranda warnings had been given. The government appealed.
We noted, among other factors, that these events took place at the youth center, "an environment with considerable overtones of authority and control." In re I.J., 906 A.2d at 262. Although we looked to "school" cases from other jurisdictions for guidance,[9] we acknowledged that "the youth center's environment was likely more coercive than that of a school." Id. Furthermore, as summarized above, I.J. had been caught in possession of marijuana and immediately admitted that the "loot" was his; the police were called, and he was detained in a small room until a uniformed officer arrived.
Here, by contrast, the record does not indicate that school authorities coerced J. into meeting with Investigator Gerald. Moreover, in I.J. there were no factual findings comparable to those presented here. The court found Investigator Gerald "very credible." He was "quiet" and "soft-spoken" when testifying  he had "an avuncular manner"  and the court had no reason to think he behaved differently while interviewing J. (J. presented no testimony to challenge the officer's account.) Nobody told J. that he had to talk to the police, and there was nothing to indicate that Investigator Gerald "was at all overbearing." Indeed, the court concluded, "[J.] had no reason to think that this was custodial interrogation." All things considered, "it was about as gentle an interview as one could imagine under those circumstances."
The trial court recognized that the investigator "did not tell [J.] that he did not have to answer questions [and] that, if he wished, he was free to leave." However, the court concluded, "to rule that this particular interview was custodial because Investigator Gerald did not advise [J.] that he was free not to answer questions and he was free to leave would, in effect, on these facts, impose what would amount to an across-the-board prophylactic rule that any time the police wanted to speak to a child in school, no matter how non-coercive the circumstances otherwise were[,] . . . the police would . . . always have to do that." Reiterating that it could not imagine "any less coercive circumstances of an interview *650 at school," the court declined to impose such a per se rule. We likewise decline to do so.
It certainly is a relevant, and important, part of the totality of the circumstances if the person being interviewed was told that he did not have to talk with the police officer and was, in fact, free to leave. See, e.g., McIlwain v. United States, 568 A.2d 470, 472-73 & n. 3 (D.C.1989) (holding that suspect was not in custody, even though confined to his room by police, where he was told that he was not under arrest and did not have to talk); In re Loredo, 125 Or.App. 390, 865 P.2d 1312, 1313-14 (1993) (thirteen-year-old interviewed in principal's office was not in custody; analyzing totality of the circumstances, including that officer told youth he was not under arrest, could leave if he wanted to, and did not have to speak with him); In re CSC, 118 P.3d 970, 976 (Wyo.2005) (juvenile not in custody when interviewed in large conference room at high school by four police officers and a school official; court analyzed several factors, including that CSC was told he did not have to talk to the officers, was free to leave, and was not under arrest). However, a totality of the circumstances inquiry, by its nature, eschews per se rules. See United States v. Drayton, 536 U.S. 194, 206-07, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (Court has rejected "the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search"; "the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning."). We thus have not insisted that giving such advice is a sine qua non for avoiding a finding of Miranda "custody." See, e.g., Morales, 866 A.2d at 72 (adult suspect not in custody; "although the police did not tell Morales that she was free to terminate the interview, they did not threaten her with arrest or tell her that she had no choice but to cooperate with them"). Although the absence of such advice certainly weighs in J.'s favor, it does not, by itself, control the outcome of this case.
Nor does his age require suppression. "The Supreme Court has not definitively ruled on whether a suspect's youth is part of the objective Miranda custody analysis." I.J., 906 A.2d at 262 n. 12 (citing Yarborough v. Alvarado, 541 U.S. 652, 668, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). Cf. In re J.M., 619 A.2d 497, 501-02 (D.C. 1992) (en banc) (age of juvenile was not relevant to issue of Fourth Amendment seizure, but was relevant to voluntariness of consent to search). We need not decide that issue ourselves, because the trial court in effect gave J. the benefit of the legal doubt. Judge Johnson opined "that [J.'s] age is very much a factor here" and decided to give it "substantial weight." Nevertheless, considering J.'s youth, "along with all the surrounding circumstances," the court concluded that "[t]he circumstances of this interview were . . . as non-custodial as one could imagine of an interview of a juvenile in school by a law enforcement officer."
We recognize that some of the court's statements are, at least in part, conclusions of law with which we are free to disagree. Nevertheless, they also establish what happened and describe the atmosphere in the room. As we explained in I.J., the first step in the inquiry is to determine "what were the circumstances surrounding the interrogation." 906 A.2d at 256 (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). This inquiry is "distinctly factual," id. (quoting Thompson, 516 U.S. at 112, 116 S.Ct. 457), and, as we have noted, we must defer to the trial judge's factual *651 findings and accept any reasonable inferences he has drawn from the evidence.
When it comes to applying "the controlling legal standard to the historical facts[,]" however, we exercise "independent review." Id. (quoting Thompson, 516 U.S. at 112-13, 116 S.Ct. 457). Doing so, we keep in mind that "Miranda focused upon the pressure inherent in the `incommunicado interrogation of individuals in a police-dominated atmosphere.'" I.J., 906 A.2d at 255 (quoting Miranda, 384 U.S. at 445, 86 S.Ct. 1602). As the trial court found, Investigator Gerald did not restrain J. in any fashion, nor was he overbearing or dominating.[10] On this record, "we cannot conclude as a matter of law that [J.] was in custody when the police interrogated [him], i.e., that [his] freedom of action was curtailed to a degree associated with a formal arrest." Morales, 866 A.2d at 74. We therefore affirm the trial court's ruling denying the motion to suppress.

III.
Appellant also contends that the evidence presented at his delinquency hearing was insufficient to support the finding of "involved" because J.'s written confession to Investigator Gerald was the crux of the prosecution's case and yet, he argues, was not corroborated as required by Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). In that case, the Supreme Court set forth a corroboration requirement as a matter of federal evidentiary law that requires "the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement" before a confession can be submitted to the jury and can sustain a conviction. 348 U.S. at 93, 75 S.Ct. 158. The Court explained that the quantum of "corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. . . . It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." Id. In a second case decided the same day, the Court explained that "corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty." Smith v. United States, 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1954).[11]
*652 In our jurisdiction, we have adhered to the corroboration requirement enunciated in Opper. See, e.g., Adams v. United States, 502 A.2d 1011, 1022-23 (D.C.1986); see also D.C.Super. Ct. Juv. R. 111 (2001) ("A constitutionally admissible, extra-judicial statement is insufficient to support a finding that the child committed the acts alleged in the petition unless it is corroborated by other evidence."). This requirement is intended "to forestall convictions based on extrajudicial confessions the reliability of which is a matter of suspicion." Adams, 502 A.2d at 1022; Smith, supra, 348 U.S. at 153, 75 S.Ct. 194 ("Its purpose is to prevent `errors in convictions based upon untrue confessions alone[.]'") (citation omitted). By requiring the corroboration of a confession, "[w]e therefore strike a balance between the need for such highly probative evidence as a confession or admission and the concern that such confessions may have been procured under circumstances that render them untrustworthy." Laumer v. United States, 409 A.2d 190, 197 (D.C.1979) (en banc).[12]
As our cases demonstrate, the government can use circumstantial evidence to corroborate a confession, and the amount and kind of evidence needed to corroborate a confession will depend upon the facts of each case. See, e.g., District of Columbia v. Whitley, 640 A.2d 710, 713-14 (D.C.1994) (confession to driving while intoxicated was sufficiently corroborated by evidence that a police officer found defendant urinating next to a vehicle that had keys in the ignition and the engine and headlights turned on); Adams, supra, 502 A.2d at 1023-24 (confession in sodomy/murder case was sufficiently corroborated by notes in the defendant's and victim's homes suggesting a rendezvous, the discovery of the victim's body inside defendant's apartment building, and defendant's corroborated admissions to additional acts of sodomy with the victim and other persons); Harrison v. United States, 281 A.2d 222, 225 (D.C.1971) (confession that defendant purchased stolen property was sufficiently corroborated by testimony establishing the theft and testimony relating a hearsay admission from the person who sold defendant the property); McKoy v. United States, 263 A.2d 649, 651 (D.C. 1970) (confession that needles and syringes were possessed as "implements of a crime" described a "highly likely" situation and was sufficiently corroborated by the fact that non-medical personnel "most often" possess such items for use with illicit narcotics). But see In re R.A.B., 399 A.2d 81, 83-84 (D.C.1979) (reversing because confession was insufficiently corroborated by juvenile's presence in and flight from the area in which the crime occurred).
We note, as a threshold matter, that J.'s confession was made voluntarily and coherently under trustworthy circumstances and there are no signs that the confession was false, factors relevant to the degree of corroboration required. The trial court *653 here, in denying the defense motion for judgment of acquittal, found J.'s confession sufficiently corroborated by substantial independent evidence, including: (1) the mother's testimony that established the date, time, and location of the offense and J.'s opportunity to commit the offense; (2) J.'s denial of the offense in response to his mother's initial inquiry; (3) J.'s additional admissions to his grandmother ("I did it") and to his mother ("I just wanted to know how it felt") after his interview with Investigator Gerald; and (4) the mother's actions in reporting the incident and seeking medical treatment for U. The court also noted that "there was no evidence which would tend to undermine the trustworthiness of [J.]'s confessions, first to Investigator Gerald, then to his mother, except his age."
Appellant contends that this corroborating evidence specifically cited by the trial court was insufficient because certain parts were themselves uncorroborated admissions,[13] parts were built on the untested hearsay statements of U., who did not testify at trial, and parts described innocent facts not probative of appellant's guilt. The government, on the other hand, argues that we should also take into consideration, for the truth of the matter asserted, the hearsay report of abuse made by U. to her mother, R.H., and repeated by R.H. to Dr. Pierce, that had been admitted at trial for a more limited purpose only; namely, to establish the fact that the victim made a prompt report of the abuse. See Battle v. United States, 630 A.2d 211, 216-17, 223 (D.C.1993) (discussing the admissibility of reports of sexual assault).[14] The government contends that the substance of U.'s report is admissible for its truth pursuant to Galindo v. United States, 630 A.2d 202 (D.C.1993), as a statement made by a parent for purposes of obtaining medical treatment for a young child. We need not decide this issue,[15] because we are satisfied that the prompt report by the child of the abuse, both initially to the mother and subsequently, through the mother, to Dr. Pierce, even with its limited admissibility, can be used as evidence corroborating the appellant's confession.[16]
*654 This conclusion is informed by cases involving the former corroboration requirement for accusations of sex offenses, a requirement we long since have abandoned,[17] because both corroboration requirements shared a common rationale: protecting the defendant from fabricated, mistaken, or otherwise baseless accusations or confessions. See, e.g., United States v. Terry, 137 U.S.App. D.C. 267, 270, 422 F.2d 704, 707 (1970) (rationale for corroboration of sex offenses); Adams, supra, 502 A.2d at 1022 (rationale for corroboration of confessions). In particular, we find instructive the many cases involving accusations of sexual assault that consider evidence that a prompt report was made to be evidence that tends to establish corroboration of the complainant's testimony. See, e.g., Hughes v. United States, 113 U.S.App. D.C. 127, 129, 306 F.2d 287, 289 (1962) ("[T]he complainant made [a] prompt report to the police which is one of the most universally accepted forms of corroboration."); Fitzgerald v. United States, 443 A.2d 1295, 1302 (D.C.1982) (en banc) ("Whatever may be the law elsewhere, the corroboration threshold has never been difficult to cross in this jurisdiction. For example, reasonably prompt reporting of the incident to one's family, friends or police is considered corroboration here. . . .") (citations omitted).[18] Indeed, in the Battle case itself, the basis for argument that reports of rape should be excluded in the same manner as other prior consistent statements was the abolition of the corroboration requirement as the rationale for such admissions. As we there noted, 630 A.2d at 217, "a report of rape was one way to meet the corroboration requirement in this jurisdiction."
Certainly there are distinctions between the corroboration formerly required for sex offenses and the corroboration required for confessions, but in at least some respects, the distinctions tend to cut in favor of affirmance here. For example, in sex offense cases, the complainant's prompt report was allowed to corroborate the complainant's own testimony, whereas with confessions, the corroborative report from the victim truly is external and independent of the defendant's confession. Furthermore, corroboration of a sex offense historically has required proof of the corpus delicti  that is, that a crime has been committed  while confessions only require "substantial independent evidence which would tend to establish the trustworthiness of the statement." See Opper, 348 U.S. at 93, 75 S.Ct. 158 (noting that the quantum of "corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti"); *655 see also Calhoun v. United States, 130 U.S.App.D.C. 266, 268, 399 F.2d 999, 1001 (1968) ("The law in the District of Columbia has long required corroboration of identity, as well as proof of the corpus delicti to sustain conviction for rape.").[19] Considering the heightened evidentiary value of a prompt report from a third person and the lower quantum of proof required to corroborate a confession, we see no reason not to consider the limited fact, pursuant to Battle, that U. made a prompt report to her mother to be evidence probative of the trustworthiness of appellant's confession. U. was a small child who had no apparent motive to fabricate and her report was apparently prompt, spontaneous, voluntary, and consistent with J's subsequent confession.
We need not decide in the instant case whether a prompt report of sexual assault standing utterly alone could be sufficient to corroborate a confession. The other facts cited by the trial court, and the added fact of the appellant's hasty departure to his grandmother's notwithstanding his agreement to await the police, while perhaps sharing individually the weaknesses identified by appellant, are not irrelevant. As discussed above, corroborating evidence need only support "the essential facts admitted sufficiently to justify a jury inference of their truth." Opper, 348 U.S. at 93, 75 S.Ct. 158. We are satisfied that this requirement was met in the present case. Accordingly, viewing the trial as a whole, we conclude that the evidence adduced at appellant's juvenile hearing was sufficient under Opper to support the finding that he was "involved" in the offense beyond a reasonable doubt.
The judgment appealed from is
Affirmed.
NOTES
[*] Part II of this opinion was authored principally by Judge Fisher and Part III of the opinion by Judge Steadman.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] "Peter meat" is the child's term for penis as taught to her by her mother.
[3] R.H. was not certain whether J. overheard the conversation that she had with her daughter in the bathroom.
[4] J. went to live with his maternal grandmother after this incident. The grandmother maintained custody of J. throughout these lengthy proceedings.
[5] Inspector Gerald was a member of the Metropolitan Police Department's Youth and Preventive Services Division.
[6] The six-week delay in questioning J. is not entirely explained; apparently Investigator Gerald was away from this area for a time and there were also unsuccessful attempts to schedule a meeting with J. at his grandmother's home.
[7] Investigator Gerald was "not sure if there was an announcement over an intercom or if someone actually went to get him. . . ." When Investigator Gerald met J. in the hallway, no one was escorting him.
[8] That Code section provides in pertinent part: "Whoever, being at least 4 years older than a child, engages in a sexual act with that child or causes that child to engage in a sexual act shall be imprisoned for any term of years or for life and, in addition, may be fined an amount not to exceed $250,000."
[9] These cases, understandably, do not reach uniform conclusions. Several cases holding that the youth was in Miranda custody are cited in I.J. See 906 A.2d at 263 & n. 14. However, we also cited Doe v. Bagan, 41 F.3d 571 (10th Cir.1994), where a nine-year-old boy was interviewed in the principal's office by a Social Services caseworker regarding sexual abuse of a younger girl. Considering a claim for damages under 42 U.S.C. § 1983, the court held that the boy was not in custody: "Plaintiffs have offered no evidence to suggest that the interview with Bagan involved any of the raiments of arrest or approached the potentiality for compulsion with which the Court was concerned in Miranda." Id. at 574-75 n. 3. See also People v. Savory, 105 Ill.App.3d 1023, 61 Ill.Dec. 737, 435 N.E.2d 226 (1982) (although he initially said he did not want to talk with them, fourteen-year-old boy not in custody when interviewed by two police officers in room adjacent to the principal's office); In re Drolshagen, 280 S.C. 84, 310 S.E.2d 927 (1984) (juvenile questioned by school officials in presence of police officers; "Merely because the questioning took place in the principal's office, in the presence of police officers, did not render it a custodial interrogation." (internal quotation marks omitted)); J.D. v. Commonwealth, 42 Va.App. 329, 591 S.E.2d 721, 725 (2004) (fourteen-year-old questioned by associate principal; police officer present, but silent; alternative holding that juvenile was not in custody for Miranda purposes).
[10] The trial court also concluded that J. had not been seized for Fourth Amendment purposes. But even if we posit that a reasonable person of J.'s immaturity would not have felt free to leave before the investigator finished questioning him, that is not dispositive. See In re I.J., 906 A.2d at 256 ("this [free-to-leave] inquiry, though necessary, is not sufficient"); United States v. Newton, 369 F.3d 659, 670 (2d Cir.2004) ("The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing Miranda custody."). On this record, we think that a juvenile in J.'s position would not have felt that his freedom of movement was restrained to the degree associated with a formal arrest. From among the factors discussed above, we reiterate that J. had not been detained by school authorities awaiting the arrival of a police officer, no restraints had been placed upon him, and the interview was conducted in a gentle manner by a plain-clothed officer whose firearm was not visible. Moreover, the room was large, looked somewhat like a library, and had a wall of windows, hardly the typical setting for "incommunicado interrogation of individuals in a police-dominated atmosphere."
[11] In Opper, the Court explained the purpose of the requirement thus:

In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination.
348 U.S. at 89-90, 75 S.Ct. 158.
[12] The corroboration rule applies not only to strict confessions that contain a complete and conscious admission of guilt, but also to admissions of essential facts or elements of the offense. Opper, supra, 348 U.S. at 90-92, 75 S.Ct. 158; see also Starr v. United States, 105 U.S.App. D.C. 91, 94 n. 3, 264 F.2d 377, 380 n. 3 (1958) (observing that Opper requires corroboration for "those exculpatory statements which in fact are of the same character as confessions, i.e., statements of the accused denying guilt but admitting facts essential to prove the charge or admitting elements of the crime charged").
[13] Although a corroborated admission may be used to corroborate other extrajudicial admissions, Adams, supra, 502 A.2d at 1023 n. 17, an uncorroborated admission cannot do the same. See United States v. Calderon, 348 U.S. 160, 165, 75 S.Ct. 186, 99 L.Ed. 202 (1954) (holding that records "obtained from the respondent, and standing uncorroborated, cannot serve to corroborate respondent's other admissions"); see also McCORMICK ON EVIDENCE § 146, at 525 n. 2 (John W. Strong ed., 5th ed. 1999).
[14] This so-called "report of rape rule" has been applied to other types of sexual offenses, as indeed it was in Battle itself. It is true that in this case the prompt report of the sexual offense by U. did not inform an evaluation of U.'s credibility because she did not testify. Cf. Jenkins v. United States, 870 A.2d 27, 34 (D.C.2005). However, as discussed infra, the fact that a complaint was made would serve to corroborate the occurrence of the offense, however proven, as well as the trustworthiness of a confession, as here.
[15] In Jenkins v. United States, this court questioned the scope of the Galindo ruling and observed that Galindo "did not come to grips with the evidentiary question [of] whether a child's second-level hearsay description of her sexual assault contained in a medical record is admissible under the medical diagnosis exception to the hearsay rule" and "a more careful reading [of Galindo] would conclude that this court left that question open." 870 A.2d at 38.
[16] This court may affirm a decision for reasons other than those given by the trial court. Randolph v. United States, 882 A.2d 210, 218 (D.C.2005). Because we do not disturb the trial court's decision not to admit the statements for the truth of the matter asserted, we need not reach appellant's argument that doing so would violate appellant's rights under the confrontation clause of the U.S. Constitution pursuant to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). See Crawford, 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (noting that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted").
[17] See Arnold v. United States, 358 A.2d 335, 344 (D.C.1976) (en banc) (eliminating corroboration requirement for sexual offenses involving "mature female" victims); Gary v. United States, 499 A.2d 815, 833 (D.C.1985) (en banc) (eliminating corroboration requirement for child victims of sexual offenses); see also D.C.Code § 23-114 (2001) ("[I]ndependent corroboration of the testimony of a child victim is not required to warrant a conviction.").
[18] See also, e.g., Hall v. United States, 400 A.2d 1063, 1065 (D.C.1979) (finding accusation corroborated by prompt report, among other circumstances); Douglas v. United States, 386 A.2d 289, 294 (D.C.1978) (same); Bailey v. United States, 132 U.S.App.D.C. 82, 87-88, 405 F.2d 1352, 1357-58 (1968) (same); Ewing v. United States, 77 U.S.App.D.C. 14, 17, 135 F.2d 633, 636 (1942) (same).
[19] See also Terry, supra, 137 U.S.App. D.C. at 270, 422 F.2d at 707 ("As a basic principle, it seems clear that corroboration in a case involving an alleged sex offense is any evidence, outside of the complainant's testimony, which has probative value  any evidence which could convince the trier of fact that the crime was committed."); In re W.E.P., 318 A.2d 286, 288 (D.C.1974) ("Inasmuch as the principal purpose of requiring corroborative evidence [in sex offense cases] is the avoidance of baseless accusations, such evidence will suffice when it would permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication.") (citations and internal quotations omitted).