London FORD, Appellant

v.

UNITED STATES, Appellee.

No. 00–CF–671.

District of Columbia Court of Appeals.

Argued Feb. 10, 2005.

Resubmitted July 11, 2007.

Decided Sept. 6, 2007.

Andrew J.J. Delahanty, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time, John R. Fisher, Assistant United States Attorney at the time, and Elizabeth Trosman and Glenn L. Kirschner, Assistant United States Attorneys, were on the original brief, and with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III and Glenn L. Kirschner, Assistant United States Attorneys, were on the supplemental brief, for appellee.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

A jury found London Ford guilty of armed manslaughter, assault with a dangerous weapon (ADW), and related weapons offenses. The ADW conviction was based on evidence that on June 21, 1999, Ford pistol-whipped Richard Black after Black had mistakenly crashed into and damaged appellant's car, then failed to make good (entirely) on his promise to pay for the damage. The manslaughter conviction stemmed from evidence that, following the pistol-whipping, Ford armed himself and went to Black's "territory" with Jimmy Shelton to further demand payment (telling Shelton that if Black "didn't pay him his money ... he [was] going to have to kill him"). There a shoot-out took place between Ford, Black, and others in the course of which Helen Foster–El, a neighborhood resident, was accidentally shot to death.

On appeal, the main questions presented are whether Ford was in custody when, at the police station, he made partly self-incriminating statements about the Foster–El shooting without having been advised of his *Miranda* rights;[1] and whether, assuming he was in custody, his videotaped statements made after he had been told of, and waived, those rights were admissible despite the earlier, unwarned interrogation. *See Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004); *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).[2]

We do not decide the close question of whether Ford was in custody at the time of the interrogation; we hold instead that his postwarning statements were admissible under *Elstad,* and that the exception to the reach of that decision carved out by *Seibert* does not call for a different result. As Ford's prewarning statements were uncoerced, his postwarning statements were likewise made after voluntary waiver of his *Miranda* rights, and the trial judge properly found after remand that the police had not deliberately employed a two-step

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. It is beyond dispute, on this record, that if the answer to the second question is "yes," then any error in the jury also having learned the content of Ford's prewarning statements was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

"question-first" strategy designed "to undermine the *Miranda* warning," *Seibert*, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring), there is no basis on which to suppress Ford's postwarning statements.[3]

## I.

Two days after the shooting of Ms. Foster–El, police officers went to Ford's home, having learned at roll-call that "he was a possible suspect [in] or a witness [to]" the shooting and was "wanted ... for questioning." Ford's mother greeted them at the apartment and notified him by telephone that the police wanted to speak to him. Ford soon arrived home, where the officers patted him down and told him that, although he was not under arrest, he was wanted for questioning and "would need" to come to the Sixth District police station to speak with detectives. When he agreed to accompany them, he was handcuffed, placed in a police cruiser, and driven to the station. There officers removed his handcuffs and led him to an interview room, where they left him unrestrained for the time being with the door to the room open. Later, detectives entered and, over a period of three hours, interviewed him three separate times, the third consisting of the videotaped questioning through which the jury mainly learned of appellant's admissions.

At the remand hearing, see note 3, *supra*, the lone witness called by the government was Detective Monica Shields, who the judge later found had "testified credibly" at the hearing. Shields had not been among the officers who accompanied Ford to the police station. When she saw him seated in the interview room there on June 23, 1999, she had not been told why he was there but recognized him because she had questioned him a year earlier about the shooting of his cousin—though she also knew that he was believed to have "some type of involvement in the [Foster–El] shooting ... as being there on the scene or as a witness." She did not believe that he was in custody when she saw him: the door to the interview room was open, no one else was present, she knew that the room was one used to interview witnesses and complainants as well as suspects, and customarily persons interviewed there who were in custody would be handcuffed and/or otherwise restrained and not left alone without a guard posted at the door. The judge credited Shields' testimony that, "[i]n her view, [Ford] was not under arrest or in custody at the time," a belief the judge found to be "reasonable."

Shields entered the room, reintroduced herself to Ford, and asked him if he had any further information about his cousin's still unsolved murder. She saw that he was crying, and when she asked him why, "he started talking from there ... it was something in reference to the cousin's case and then he just went into talking about the [Foster–El] case." Shields "let him talk," which he did for about twenty minutes, during which he admitted that he had been present at the shooting scene with a gun and had "fir[ed] upon others who had fired on him." After he admitted these facts, Shields read him his rights from a PD–47 form and obtained his waiver of them. She also told him that he was under arrest. The judge found that this first interview, lasting about an hour, was divided more or less equally between dis-

---

**3.** The trial judge had determined that appellant was not in custody at the relevant time, and thus did not reach the *Elstad* issue (*Seibert* had not yet been decided). Following initial briefing and oral argument in this court, we remanded the record for the judge to make findings, and take additional testimony as necessary, relevant to the applicability of *Elstad* and *Seibert* to Ford's postwarning statements.

cussion of the cousin's slaying and the Foster–El case.

During that interview another detective, Smith, had been in the room with Shields and Ford, although Smith had asked only one or two questions. At the second interview a short while later, Detective Crawford replaced Smith. Ford willingly repeated all of the statements he had made to Shields earlier: "[t]here was no difference," she testified. Ford admitted having "participated at the time the gunshots were fired," again essentially claiming self-defense. The detectives then asked him to make a third, videotaped statement, and he agreed to do so.

Shields denied that there was any "practice, whether it was an announced [police department] policy or not, . . . of the Sixth District homicide detectives back in 1999 and 2000" of "interrogat[ing] persons in custody] first without warning them, get[ting] a confession, then giv[ing] Miranda warnings, and then get[ting] them to repeat the confession." The trial judge found that, because no evidence had been presented of such a practice or policy, and because Shields "believed and had reason to believe that Mr. Ford was not in custody when she saw him in the interview room" and began questioning him, any arguable error in the detective's failure to give Miranda warnings initially was not committed "deliberately or in bad faith." The record, in the judge's view, did not permit a finding "that this was . . . an intentional policy-driven, calculated strategy of the police to first question a witness or a suspect . . . to take advantage of [him] and subsequently seek a statement after Miranda warnings were given."

## II.

The government first argues that Ford was not in police custody before he made incriminating statements and was given Miranda warnings, so that no issue arises under Elstad and Seibert about the admissibility of such statements made after a Miranda violation. It points to facts such as that, although Ford was told by police when he returned home that "he was wanted for questioning" and "would need to come to the 6th District and talk with detectives," he was also told that "he wasn't under arrest," and (a) the police displayed no weapons and exercised no force other than frisking him and briefly handcuffing him to insure their safety during the trip, and (b), once at the station, they left him unhandcuffed and unguarded in an interview room. Indeed, the government suggests, it was only "happenstance" that Ford accompanied them to the station as he did; they had "arranged with [his] mother for him to go to the police station on his own, but his arrival [home] before they left trumped their plan" (Br. for U.S. at 29). The implication is that, just as the officers considered Ford "free to decline their request" that he go with them (id. at 28), so he made a voluntary choice to be interviewed at this time rather than later and to go with them for that reason. In short, the government says, neither while he was transported nor while in the interview room could Ford reasonably have believed that he was under restraints "of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam). The trial judge agreed.

 The issue, however, is a complex and close one.[4] First, the fact remains

4. Although this court defers to the trial court's findings of "historical fact" as to "the circumstances surrounding the interrogation," we exercise "independent review" when applying "the controlling legal standard" of custody to those facts. In re J.H., 928 A.2d 643, 651, 2007 D.C.App. Lexis 402, *18 (D.C.2007) (citing and quoting In re I.J., 906 A.2d 249, 261–62 (D.C.2006)).

that Ford did not "arriv[e at the police station] on his own accord," but rather "[t]he police ... transport[ed him there]," *Yarborough v. Alvarado*, 541 U.S. 652, 664–65, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004), after telling him that he was "wanted for questioning" about a murder and "would *need to*" (emphasis added) come to the station, and after frisking and handcuffing him when he agreed to go with them. The determination of whether someone was in custody "must be undertaken from the perspective of what a reasonable person [in the defendant's shoes] would believe, given the overall tenor of the situation," *In re I.J.*, *supra* note 4, 906 A.2d at 261; and it is by no means obvious that Ford, reasonably viewing these circumstances all together, would have seen himself faced merely with an invitation to be questioned that he was free to ignore or defer to another occasion. Moreover, whether or not Ford was under guard in the interview room (where he was not told he was free to leave, *see id.* at 260), the questioning that followed "t[ook] place in 'police dominated surroundings' similar to the interrogation at issue in *Miranda*," *United States v. Turner*, 761 A.2d 845, 852 (D.C.2000), and continued for a substantial length of time—the judge found it be approximately an hour—before he was given his *Miranda* warnings. *See Yarborough*, 541 U.S. at 665, 124 S.Ct. 2140.

Consequently, the government has not persuaded us that we may simply affirm the judge's no-custody determination and spare ourselves the inquiry under *Elstad* and *Seibert* for which we remanded the record. Forced to resolve the issue of custody, we might well conclude that "a reasonable person in [Ford's] situation," taking everything into account, "would have believed that his freedom was being restrained to 'the degree associated with a formal arrest.'" *I.J.*, *supra* note 4, 906 A.2d at 264 (quoting *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517). But we do not decide that question—rather we assume *arguendo* that Ford was in custody for *Miranda* purposes—because, for the reasons that follow, Ford's videotaped statements were admissible under *Elstad* and were not made inadmissible by *Seibert*.

### III.

Although Ford was not advised of his *Miranda* rights before he first made the statements ultimately repeated in the videotaped interview, he does not argue, and could not reasonably argue, that either the prewarning statements or his later statements resulted from official coercion and were thus involuntary in the traditional sense. *See Elstad*, 470 U.S. at 304–05, 105 S.Ct. 1285 (discussing standards for classic involuntariness). Nor does he dispute that, once advised of his rights under *Miranda*, he knowingly and voluntarily waived them—unless, as he argues, his previous, unwarned statements themselves compelled the later ones, either psychologically or as a matter of law. *See* Br. for App. at 21 ("Once Ford had confessed, all subsequent police interrogation ... was based on that first statement, and must be suppressed as derivative."). Applying first the *Elstad* decision to these circumstances, and reserving the applicability of *Seibert* until later, we conclude that the post-*Miranda* videotaped statements were admissible.

### A.

In *Elstad* the defendant, a burglary suspect, made incriminating statements to a police officer at his home (though in custody) without first being advised of his *Miranda* rights. Officers then took him to the county sheriff's office, placed him in an interrogation room, read him his *Miranda* rights, and questioned him at length during which he expanded on his earlier statements and made a full confession. 470

U.S. at 301–02, 105 S.Ct. 1285. In the Supreme Court, the defendant argued that this confession, although made after a proper *Miranda* warning, should be suppressed as "fruit of the poisonous tree" because it was tainted by the earlier unwarned statements. *Id.* at 303, 105 S.Ct. 1285. He also argued that the coercive impact of the unwarned statement—his having "let the cat out the bag" psychologically—required suppression because that statement undermined the voluntariness of his post-warning statement. *Id.* at 302–04, 105 S.Ct. 1285.

The Supreme Court rejected both of these arguments by focusing on the voluntariness of Elstad's unwarned statements. It reasoned that, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the postwarning confession. *Id.* at 314, 105 S.Ct. 1285. Rather, "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Id.* at 308, 105 S.Ct. 1285. A "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. 1285. It would be, the Court concluded, an

> unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* at 309, 105 S.Ct. 1285; *see id.* at 311, 105 S.Ct. 1285 ("endowing the psychological effects of *voluntary* unwarned admissions with constitutional implications would ... disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confessions") (emphasis in original).

Because there is no record basis for holding that Ford's prewarning statements to Detective Shields were involuntary or that his succeeding waiver of the *Miranda* rights was not voluntary and informed, *Elstad*, viewed by itself, would dictate the admissibility of his videotaped statements.

### B.

But *Elstad* does not stand alone, as this court and numerous others have recognized. Its refusal to extend *Miranda's* reach in the manner just described was subsequently limited by *Seibert, see Edwards v. United States*, 923 A.2d 840, 844 (D.C.2007) (the Supreme Court in *Seibert* "limited its holding in *Elstad*"), and the issues we must decide are (1) the scope of that limitation and (2) whether it affects the disposition of this appeal.

#### 1.

*Seibert* concerned the admissibility of incriminating statements obtained by police using a conscious two-step interrogation strategy, termed "question-first," that called for withholding of the *Miranda* warning until the suspect confessed, after which he would be given the warning and, if the ploy succeeded (as it did in *Seibert*), would repeat the confession. *See* 542 U.S. at 604, 609–11, 124·S.Ct. 2601 (Souter, J., plurality opinion); *id.* at 620–21, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). The defendant in *Seibert*, as in *Elstad*, had made incriminating statements both before and after receiving the *Miranda* warning; the trial judge suppressed the prewarning statements but admitted the postwarning confession under *Elstad*.

Nevertheless, although Seibert's pre-warning statements, like Elstad's, had been uncoerced and voluntarily made, five Justices of the Court distinguished that case from *Elstad* and upheld the suppression of his confession by the Supreme Court of Missouri. Unlike the four dissenters, who would have applied *Elstad* and remanded for a determination of voluntariness, *see id.* at 628, 124 S.Ct. 2601 (O'Connor, J., dissenting) ("I would analyze the two-step interrogation procedure under the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad* "), these five Justices agreed that some two-step interrogations yield inadmissible statements even if the statements are voluntary in fact. Their reasoning did not produce a majority opinion, however. Writing for the plurality, Justice Souter said that "[t]he threshold issue [whenever] interrogators question first and warn later is ... whether it would be reasonable to find that in these circumstances the warnings could function effectively as *Miranda* requires," *id.* at 611–12, 124 S.Ct. 2601, an issue that courts would decide by considering multiple objective factors that he illustrated.[5]

Justice Kennedy, by contrast, in supplying the fifth vote for suppression, viewed the plurality's test for admissibility as "cutting too broadly" because it would apply "to every two-stage interrogation." *Id.*

at 621–22, 124 S.Ct. 2601. Instead, he narrowed the inquiry to two parts: a court must first decide whether law enforcement officers made a "deliberate" choice to flout or circumvent *Miranda* by using a two-step strategy; and, if they did, the second confession is inadmissible "unless curative measures [were] taken before the post-warning statement [was] made."[6] But, in Justice Kennedy's view, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.*

▮▮▮▮ Ordinarily, "when a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citation and internal quotation marks omitted). *See also Panetti v. Quarterman,* —— U.S. ——, ——, 127 S.Ct. 2842, 2856, 168 L.Ed.2d 662, —— (2007) ("[W]hen there is no majority opinion, the narrower holding controls."); *Edwards,* 923 A.2d at 848 (citing *Marks,* 430 U.S. at 193, 97 S.Ct. 990). In *Edwards,* this court pointed out that "Justice Kennedy's opinion [in *Seibert* ] is generally considered to be narrower than the plurality opinion." *Edwards,* 923 A.2d at 848. Indeed, the United States Court

---

**5.** "These factors include (1) 'the completeness and detail of the questions and answers in the first round of interrogation,' (2) 'the overlapping content of the two statements,' (3) 'the timing and the setting of the first and second' interrogations, (4) 'the continuity of police personnel,' and (5) 'the degree to which the interrogator's questions treated the second round as continuous with the first.' " *Edwards,* 923 A.2d at 845–46 (quoting *Seibert,* 542 U.S. at 615, 124 S.Ct. 2601) (Souter, J., plurality opinion).

**6.** "Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances.... Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment).

of Appeals for the Second Circuit recently joined what it said are *"all* of our sister circuits that have decided the issue" in concluding that *"Seibert* ... carved out an exception to *Elstad* for cases in which"— per Justice Kennedy's analysis—"a deliberate, two-step strategy was used ... to obtain the postwarning confession." *United States v. Carter,* 489 F.3d 528, 535 (2d Cir.2007) (emphasis added).[7] We align ourselves with this conclusion as well. As the court explained in *United States v. Williams,* 435 F.3d 1148 (9th Cir.2006):

> Although the [*Seibert*] plurality would consider all two-stage interrogations eligible for a *Seibert* inquiry [into the objective facts surrounding the delayed advice of rights], Justice Kennedy's opinion narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken Miranda's protections. In other words, both the plurality and Justice Kennedy agree that where law enforcement officers *deliberately* employ a two-step interrogation ... and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court should suppress the confession. This narrower test—that excludes confes-

sions made after a deliberate, objectively ineffective mid-stream warning—represents *Seibert's* holding. In situations where the two-step strategy was not deliberately employed, *Elstad* continues to govern the admissibility of postwarning statements.

*Id.* at 1158 (emphasis in original).

We thus conclude, in keeping with the clear consensus of authority elsewhere, "that *Seibert,* rather than overruling *Elstad,* carved out an exception to [it] for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." *Carter,* 489 F.3d at 535.[8]

### 2.

 We turn, finally, to whether the trial judge on remand properly found that the police, and Detective Shields in particular, had not deliberately engaged in a variant of the "question-first" strategy condemned in *Seibert.* The court in *United States v. Narvaez–Gomez,* 489 F.3d 970 (9th Cir.2007), "determine[d] that a deliberateness finding [required by *Seibert* ] is appropriately reviewed as a factual finding for clear error," noting that this "is consistent with our review of similar [trial] court determinations as to credibility and deliberateness." *Id.* at 974. A key feature of Judge Canan's

---

**7.** The court cited decisions from the Third, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits. *See also United States v. Mashburn,* 406 F.3d 303, 309 (4th Cir.2005) ("Justice Kennedy's opinion ... represents the holding of the *Seibert* Court").

**8.** This court's reluctance in *Edwards, supra,* to "determine the precise analysis that follows from the opinions in *Seibert,"* 923 A.2d at 848, was understandable. In that case, we first held that applying Justice Kennedy's test "require[d] that Edwards' statements be suppressed," *id.* at 852; *see id.* at 848 ("the police obtained Edwards' self-defense statement using a two-step interrogation process

more akin to that employed in *Seibert* than the questioning at issue in *Elstad"*), but we nonetheless accepted the government's view that the *Seibert* plurality's analysis of whether the *Miranda* warnings "could function 'effectively' " despite an initial unwarned confession might be more forgiving—in terms of admissibility—than Justice Kennedy's requirement of specific "curative" measures. *See id.* at 848 n. 10. Before ordering suppression, therefore, it was necessary for us to consider both tests because, as we implicitly recognized, a finding of deliberate misuse of the two-step process is a necessary but not sufficient basis for suppression.

task on remand, of course, was to assess the credibility of Detective Shields, who had mainly conducted the prewarning questioning of Ford. This court has recognized that "[a]ny factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous." *Stroman v. United States,* 878 A.2d 1241, 1244 (D.C.2005) (quotation marks and citations omitted). In *Robinson v. United States,* 825 A.2d 318 (D.C.2003), for example, we considered the analogous due process question under *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), of whether the defendant had shown "bad faith" by the police in not obtaining and preserving a tape recording that would have been potentially useful to the conduct of the defense. The trial judge, after an evidentiary hearing on the point, had found insufficient evidence of bad faith and refused to dismiss the information. We upheld that ruling, stating that "[w]e will not disturb a trial court's finding[ ], such as the court's determination in this case that the police did not act in bad faith, unless the finding is clearly erroneous." *Robinson,* 825 A.2d at 325 (citations and quotation marks omitted). So, too, we review the trial court's finding of no deliberateness by the police in the delay of *Miranda* warnings for clear error only.

As Judge Canan found, no evidence was presented to him that a policy, formal or informal, of the Metropolitan Police or a practice by detectives in the Sixth District existed "to deliberately withhold *Miranda*

warnings" until a suspect had confessed under questioning.[9] He therefore turned to the conduct of Detective Shields, the only officer called by either side at the remand hearing and who had done nearly all of the prewarning questioning of Ford. The judge found "no evidence" that Shields herself had been "trained to engage in [the] type of interrogation-first technique" at issue in *Seibert.* And, she "testified credibly," in the judge's view, that she had not advised Ford of his rights initially because, "[w]hen she entered the interview room, . . . in her subjective viewpoint [he] was not in custody." The judge further found this belief, whether ultimately correct or not, to be "reasonable" because:

(1) although Shields was part of the homicide detective team, she had at best generalized knowledge at the time of Ford's "status in the Foster–El homicide investigation" and primarily "knew him in a different capacity as a family member of a homicide victim";

(2) the interview room was used to question complainants and witnesses as well as suspects, and Shields "was aware that [normally] when [a] suspect [there] was in custody, there would be some restraints such as handcuffs or shackling of the feet" and a guard posted, whereas Ford "sat alone, unrestrained and unguarded"; and

(3) Shields, without ulterior design, initially spoke to Ford "about this other homicide regarding a family member of his"—indeed, "[d]uring the one hour of the initial interrogation, about half was spent

**9.** Judge Canan was sensitive to that issue, stating that "this was not the first time that this [c]ourt has seen this type of interrogation [consisting of unwarned interrogation before warnings are given]," but nonetheless concluded that he had not been presented with "any concrete matter of record [in this case] that this was some informal policy that the

homicide detectives worked up to gain advantage over potential suspects." This court too has been—and will be—alert to the risks of sequential questioning by police calculated to undo *Miranda's* protections. *See Edwards, supra; Davis v. United States,* 724 A.2d 1163, 1170 (D.C.1998); *id.* at 1171–75 (Ruiz, J., dissenting).

discussing ... [that] death or ... matters" other than the Foster–El death—before Ford, "without prompting, started talking about the Foster–El case," a scenario the judge found inconsistent with a plan by Shields to steer him, unadvised, toward that subject and "intentionally or otherwise seek to undermine his *Miranda* rights."

In light of these findings, we conclude that the judge's ultimate finding of fact that Shields had not "deliberately withheld *Miranda* warnings and engaged in a stratagem to get him to confess" before being warned is supported by the record, and must be sustained.[10]

*Affirmed.*

---

**10.** Ford's remaining, unrelated argument—not the subject of an objection in the trial court—that portions of the judge's instructions to the jury on second-degree murder, voluntary manslaughter, and self-defense may have confused the jury has no substance, and we reject it.